Petitioner v. Federal Communications Commission, et al. Mr. Evans for the petitioner, Mr. Carr for the respondent. Good morning. Good morning. And may it please the court, six years ago I was before this court in the initial phase of what we'll call PMCM v. FCC. Welcome back. In which this court ruled over the very bitter and intense objection of the FCC that in fact my client had the right to relocate its station to New Jersey in compliance with the provisions of Section 331 of the Act. Since that time, the FCC's position has basically been, okay, the court made us allow you to relocate your VHF station to New Jersey, but we're only going to give you the skeleton of a VHF station. We're going to strip you of all the rights and all the privileges and all the appurtenances that normally come with being a VHF station. We're going to make you be perceived as a UHF station to your over-the-air audience. We're going to have your cable audience view you as a UHF station by requiring that you be carried on so that cable systems indefinitely don't have to carry you at all on their systems, even though there's an absolute statutory right to such carriage. And we're going to make it that we're going to assign you a channel that makes it difficult or impossible for about half of your viewing audience to actually pick you up properly on the television sets. So that's why we're back here before you today. As I understand it, you sought radio frequency three, and that's what they gave you, and that is a VHF channel. That's true. Okay, so then the question is just, did they correctly apply the protocol given that you have radio frequency three? The protocol seems to assign you to virtual channel 33. Well, that's what I'd like to talk to you about today. It turns out it's not that simple. Well, it's a question in the weeds of the protocol. It's not some massive FCC plan to disadvantage your station. Well, if you'll indulge me, let me explain it. If I want to do anything today, I want to leave you with the certainty that the FCC's application of the protocols in Annex B is wrong. I can say that very confidently for two reasons. First of all, the FCC says that if you apply the piece of protocols, you will end up with a result that gives you a single unique channel, major channel, for any television station. The problem with that is when the Commission went through the exact exercise that you have to go through to arrive at what your virtual channel should be, it ended up with two virtual channels. You would think that would have told them that there was something wrong about their application of the piece of rules, but it didn't. They just said, well, we're going to make a determination. Let's get into the weeds. As I read Annex B 1.4, that sure seems to me to apply directly to your circumstance. Well, no, it does not apply directly. What is there in that subparagraph? Well, there's been some ambiguity raised about what does it mean when you talk about a channel being previously used in the market. What do we do with ambiguities in this court? When there's ambiguity in a regulation or a statute, what does the law tell us we have to do? Well, in this instance, normally you defer to an administrative agency in interpreting its own rules. That's what the law tells us to do. But in this case, remember, we're dealing with a rule or a protocol that was developed not by the FCC, but by a completely independent agency. And as you can tell by the process, the FCC adopted by the FCC, but it has the force of law. Well, but they had to flounder around quite a bit to try to figure out what the ATS committee actually meant when it adopted these protocols. They had to go to them to try to figure out what the protocols were. Is there any authority for the proposition that a standard or a protocol adopted by an agency should be given some sort of different review by our court than if the agency had drafted that standard or protocol itself? No, I don't think there is. I don't, I was not able to find any authority to that effect. What we have here, though, is you have a situation where in interpreting the rule that the ATS committee adopted, the commission didn't have to look very far because the ATS committee itself adopted a clarifying change to the language and the rule that we're looking at right now that makes it absolutely clear that there is no ambiguity and this is the way the rule should be applied. You were the one that introduced the word ambiguity, I believe. Now you're saying there's no ambiguity. I'm saying if you look at the clarification that was issued by the ATS committee. Is that one that was adopted by the FCC? It's not the one that was adopted by the FCC, but they didn't say they were changing the 2006 rule. They said they were clarifying what the 2006 rule meant. And to me, it seems like even this court, if you had a situation where the people that adopted the rule were met by that rule, that that would have pretty important impact in the way you evaluate what the rule meant. But the text that has the force and effect of law uses the phrase, uses the word market, right? It does not use, does not use the phrase DMA market, nor does it use the phrase service area. Why isn't that a classic case where the regulation doesn't speak to which of those two possible measurements of market they have in mind? Well, those are not the key words that are, I know there was a lot of discussion in the papers that you've seen about what does market mean and what does service area mean. You need to win on market and you need to win on use. Well, yes, but if we... Okay, so let's start with market. Why isn't that a perfectly reasonable to say the market is where the signal goes? Well, it's easier to start with use because then market flows from that. If you take it that the ATSC committee was correct when it said what we meant when we say that something was previously used in a market, we meant that that channel was previously allocated in the market. That makes the whole analysis so much simpler because we know for a fact that channel three was never previously allocated to our market. Right, but use is just as ambiguous, right? It could mean allocated in the sense that you're using the word or it could mean use in a more ordinary common sense, right? If the signal reaches into Fairfield, Connecticut, channel three in Hartford is using channel three in Fairfield, Connecticut. Well, but under this allocation clarification that they issued, you don't have to worry about use. All you do is go back to the FCC's table of authorities and see was channel three ever allocated to a community in this market. You still have to answer the question whether use means allocation or the signal goes to the place it issued. Well, I can give you two answers to that. First of all, the use of the word allocation as a clarification by the committee made it clear what use means. It doesn't mean actual transmission over that signal in the market. It means allocation in the FCC's table to that market. So you don't have to worry about actual use. It's a and then if you're looking at service areas, it becomes even more problematic because the FCC's theory is that you look at... Could you help me understand? And maybe you said this and I just I just missed it. Why would we be looking to the clarification that was done by the committee? Is that something the FCC has adopted? It hasn't adopted it. They've adopted annex B, right? So shouldn't our inquiry be focused on annex B? Well, the reason I'm saying we look at the 2009 version is because it clarifies what they meant. It didn't change. They said we're not modifying the 2006 version. We're clarifying what we meant. Did you have any authority? Maybe this is Judge Wilkins' question. Do you have any authority that points to us that says that we should look to such clarified amendment by some non-governmental authority? Well, it's the non-governmental authority that actually... No, but what we're looking at is what has been adopted by the FCC, and I don't believe they've adopted the clarification you're talking about. Maybe I'm wrong. No, no. You're right. They haven't adopted it. So what's the authority that you can point to that tells us that we ought to be considering the later clarification? Well, because if you're trying to interpret a rule or a protocol in this case, I think you look to anything you can to find what did the framers of that rule mean. In this instance, you could see the commission itself went and consulted a book that was written a few years before the protocol was written to see what one of the people on the committee had to say about it to try to determine what it meant. That's what they did. What the commission didn't do, for some strange reason, they just... They put their hands over their ears and their eyes and they said we are not going to what the committee said they meant in 2009 and 2013 because we haven't adopted that. My position is that that clarifies, and they made it very clear, we're not changing what we did in 2016 or 2006. We are clarifying what we meant. But don't courts often say we don't look to like subsequent statements by Congress about what they meant when they enacted the statute because that's not really legislative history? How is your argument different than that? Well, they do say that, but in this instance, you're looking for whatever you can find that gives you what the meaning was by the framers. And to me, that's extremely conclusive because they said here's what we meant. I take your point, Judge Wilkins, but why would you ignore what the people are telling you this is what we meant if there's some confusion that has to be resolved? Suppose you're right on all of that and market means what you say and use means what you resolve the case against you. That doesn't get you an entitlement to use Channel 3, and the FCC as a matter of discretion says, well, if we give you 3.10, that will tend to harm the branding of the old Channel 3, and that's not appropriate. Well, let me address both of those points. First of all, if you agree with me on the interpretation of B4, which is that it only relates to a previously allocated channel in that market, it means that paragraph B4 doesn't apply. So that takes you back to paragraphs B1 and B2. No, it doesn't, though, because you didn't have an existing analog license, whether it's the New York DMA or whether it's the coverage area from wherever the station's based in New Jersey. You didn't have that license. You're not an incumbent. Right. That's the commission's view, and if that's correct, then paragraph 2 would apply instead of paragraph 1, because paragraph 1 says if you're a newly licensed station, which is what the FCC says, then you just use your digital over-the-air channel. So whether you apply 1 or 2, it doesn't matter. As long as paragraph 4 doesn't apply, we would still be allocated Channel 3 as our virtual channel. But to go to your further point, Judge Katz, about the FCC exercising its discretion, we thought it was pretty clear that the protocols actually give us even if they don't, here's a laundry list of factors that we know for sure apply to this situation that should govern. I mean, among the foremost of these that we knew from experience that Channel 3.10 applied, if it's applied, works perfectly. There's no confusion. There's no grand confusion. Everybody can tune into the signal that they want to tune into instead of somebody else's. We also know from experience that Channel 33 doesn't work, because we ran into the exact problems that the Commission said the application of Annex B is supposed to prevent. You also have the situation that we think is important, that there are two other stations in the New Jersey market that are allowed to have this overlap of major virtual channels with no interference and no objection by the FCC whatsoever, which thus is sort of the definition of arbitrary and capricious treatment. With no objection by the but it sort of shows you that there's really no problem here that the FCC is so concerned about the sky falling if there's overlapping major channels. There's no objection. There's no controversy for the FCC to resolve. Well, I think the question is, is it a rule or is it not a rule? If you're going to say, oh, we're only going to enforce that if somebody complains, it's not really a rule. The other thing, and I've just got a little bit of time left, but the other thing that we have to stress is that the Commission went completely overboard on assigning importance to brand protection in this case. There's nothing in the FCC's charter that says that they have any authority or any responsibility whatsoever to protect brands, and yet here that has been exalted into the single highest priority that the FCC is saying it has to place a value on, to the detriment of people actually receiving a broadcast signal and to the detriment of local programming. Unless my colleagues have any further questions, we'll hear from the FCC now. Thank you. Good morning, Your Honor. May it please the Court. My name is James Carr. I represent the Federal Commission. Mr. Evans spent a lot of time focusing on Annex B-1-4, but I think it's important to focus on PMCM's argument about why it feels it's entitled to Channel 3 under Annex B. As Judge Katz has pointed out, the focus there is on Annex B-1-1, and PMCM has been claiming that the plain of B-1-1 guarantees WJLP the assignment of Channel 3, and that plain language argument falters. It doesn't even survive the first few words of Annex B-1-1, because that provision starts for broadcasters with existing NTSC licenses, existing analog licenses. What's the answer to your question? The exercise I went through is to say, okay, 1 clearly doesn't apply because they don't have an existing license. 4 either resolves the case in your favor or doesn't apply, in which case you have discretion, and I didn't go the one extra step to look at 2. It's understandable why you didn't look at 2, Your Honor, because I think it's for the first time this morning that Mr. 2, the way I read it, assumes you have a broadcaster without any sort of conflict, where there are no other broadcasters in the service area who are disputing the channel assignment, and that's why the Commission believes that B-1-4 is the more appropriate protocol to apply here, because you have a newly licensed digital broadcaster in a market where the particular channel was previously used. But we're only reaching this 1 or 2 question on the assumption that you've lost on 4, right? Yes. So we come to it, so we assume you lose on 4, and that's just an assumption. Right. So then you go to 1, and you say, well, they had a license in Nevada, but that doesn't count. The relevant question is, do they have the license in New York? So they have no existing, and NTSC means analog, right? That's correct. No existing analog license in New York, okay, so they're out of 1, but then you come to 2, and it says new broadcaster without an existing analog license. Why wouldn't you read that to me in New York to make 2 parallel to 1? Again, I think if you read the entire annex in context, I think 2 is assuming you have a situation where there's no conflict with other broadcasters. I take your point that you're important factor to keep in mind here is that the commission was under no illusions when it adopted Annex B that that particular set of protocols was going to resolve every conceivable possibility, every conceivable situation. It does resolve most situations involving channel allocation. In fact, the majority of allocations are handled by B1.1 because you have a situation where the digital transition occurs. Most stations are still in the same market where they were before the transition. After the transition, they maintain their analog channel as their virtual channel, even if they're on a different digital radio frequency channel. The commission understood from the start that there might be situations where Annex B would not resolve this, where it wasn't clear. The commission retained the discretion to deal with situations where there were disputes over channels by weighing the different situations. I think that's what we have here. Even assuming Annex B doesn't resolve this issue, the commission is weighing the different factors and considering what should it do. It has a dispute among broadcasters about who should be on channel 3. When you think about it for a second, on the equities, here's WJLP, a newcomer to the market, has just started broadcasting in New Jersey less than four years ago. It's moving into a market, and its service area overlaps with two stations, WSSB in Hartford, KYW in Philadelphia, which have been using channel 3 for more than 50 years. And they object, and the commission has valid concerns, as those broadcasters did, about the dilution. That all makes perfect sense in the abstract. Yes. But the one possible hiccup, right, is this other statute which says, under these circumstances, the new entrant into New I'm in this fictitious world now where VHF is supposed to be better, but they're coming in as sort of a half VHF station. I get the radio frequency, but not the branding. So why isn't that a problem under that statute? Your Honor, I don't think it's a problem under that statute, because that statute, written in 1982, was focused on very high frequency channels. It's focused on radio frequency. It doesn't say anything about virtual channels. And frankly, if it was enough to have a virtual channel on a location, a VHF location, there would have been no need to have a reallocation of PMCM to New Jersey. WWR, which had been a VHF on a VHF channel in New Jersey, moved after the digital transition to a higher number on the band. But it's still a virtual channel nine. And so virtual channel is a different concept from VHF channel. It may well be that 331 has outlived its usefulness, because at this point, with the digital transition, VHF channels are simply, they're not any longer technological superior to UHF channels. In fact, some instances, there are inherent reception issues. That's part of the reason why WWR moved to a higher channel. Could you respond to Mr. Evans' point about the later clarification of subsection four? Yeah, I'm a little befuddled by it, because we discussed this in our brief. He focuses a lot on this term allotted, previously allotted. And if you look at the subsequent version, it says something about previously allotted for NTSC, that's analog, in a market. Now, if he's talking about channel allotments or the table of allotments that the commission puts out, that doesn't talk about markets, it talks about communities. And you can say, well, a community is in a particular market, but that still begs the question, what's the definition of market? The table of allotments doesn't specify anything about designated market areas or service areas, it just talks about particular communities. I'm sorry, so allotment, the concept of allotment is not necessarily or technologically connected to the DMA? Not necessarily, Ron. It's focused on particular communities. I think the DMA is a separate concept. I thought the way it works is you would have said, channel three was never allotted in the New York market, because it would have produced interference with the Hartford station or the Philadelphia station. No? Is that the wrong way of thinking? That certainly would be a possibility, depending on the power of the station in New York using channel three. And I think that's one of the concerns that was at issue here as well, even with virtual channels, that if, when PMCM initially said it was going to be using channel three, there was a concern among the other broadcasters, Meredith and CBS, that if it was going to be using channel three, 3.1, there would be reception issues where it was not clear which station would be received when there were two stations in overlapping service areas both using channel three. If I could turn to the cable carriage issue, I know that really hasn't been discussed, but I'd just like to make the point, PMCM is making an argument that the must-carry statute is unambiguous, and that the phrase channel number on which a station is broadcast over the air unambiguously means the radio frequency channel. The commission disagreed and it explained why. That phrase is undefined in the statute, and at the time that must-carry statute was passed in 1992, there wasn't any difference between the channel on which the broadcaster aired its programming, that is, the radio frequency channel, and the channel to which it was tuned to receive that station. That situation has changed since the digital transition, and it was reasonable for the commission to read that phrase, channel number, on which the station is broadcast over the air, to refer now to the virtual channel, the channel from the viewer's perspective. And that phrase channel number is at least ambiguous in terms of it suggests the number by which viewers identify the channel, and that now is different from the radio frequency channel. For example, channel four in Washington, everybody, WRC in Washington, everybody knows is channel four. In fact, its digital RF channel is now channel 48. There probably aren't too many people who know that, but the viewing public knows to tune to channel four to get that channel. And the commission's approach to this made perfect sense because it preserved the same system that had been in place before the digital transition. Before the digital transition, if I'm a non-cable subscriber one day, I tune to channel four to get WRC. The next day, the next day, I subscribe to cable, and if I want to get WRC, once again, I turn to channel four. And the point of the must-carry statute was to protect the broadcasters vis-a-vis cables. Precisely. And the idea is that the broadcasters want to reach non-cable viewers and cable subscribers on the same channel. And they're able to do that through the commission's interpretation of this statute's virtual channel, which, by the way, has been in place since 2008, and it's worked just fine for the past 10 years. PMCM's alternative interpretation would cause considerable chaos and disruption among cable channel lineups if news stations were able to claim channel positions based on their RF channel, that could have a cascading effect through cable channel lineups in various systems throughout the country. And so there's no reason for the direction when the statute is ambiguous and the commission interpreted it reasonably. I'd like to ask a question of you about your friend's Spectrum Act claim. Is the rebacking process completed, or is it ongoing? It is, Your Honor, and I think the best way to understand that is, and the commission in the incentive auction order and that is cited, unfortunately we don't cite it in the brief, but we cite the notice, the April 2017 notice announcing the end of the process, that both the repacking and the reverse and forward auctions. In footnote one of that notice, there is a citation to the incentive auction order, and at paragraphs 529 and 30 of that order, the commission explains how it works. And it may also be helpful to look at Judge Srinivasan's very fine opinion in National Association of Broadcasters in 2015 where he explains the process. It's basically a three-step process. You have the reverse auction. You then have a channel reassignment to clear Spectrum so that you can go forward with the forward auction. If the commission doesn't complete the so-called repacking or channel reallocation or reassignment before the forward auction, it doesn't know what it's able to sell. It's clearing away Spectrum so it has blocks of Spectrum that it can then go to the wireless providers and say, here's what's up for bid. So by the conclusion of the forward auction, you have the reverse and forward auctions concluded and you have the repacking concluded. Now, that's not to say, and I will hasten to add, Mr. Evans is correct that there are still some possible adjustments going forward. But the commission made clear when it discussed this issue at paragraphs 529, 530, 531 of the incentive auction order that it did not regard those subsequent adjustments as somehow making the repacking non-final, as continuing the repacking. So in our view, the relevant prohibition period here ended in April of 2017. If there are no further questions, thank you very much, Your Honors. Thank you. Mr. Evans, I don't believe you asked for rebuttal time, but I think you meant to. Okay, you didn't tell us, so we'll give you back two minutes. Maybe I can very quickly address your point, Judge Katsas, about what allotment means in this context. Channels are allotted to communities and communities are in markets. So the reason I said the allotment issues resolves anything, we don't have to worry about markets because we know that Channel 3 has never been allotted to any community, either in the DMA or in the overlap areas that the that channel has never been allotted to the market because it's a community. I see, so that's an argument. If you win on the proposition that use means allotment, you don't need to win on market. Right, because you then absolutely know for a fact that there was no previous allocation to that market. I was going to correct counsel's statement that the repacking process is done because it clearly is not done, and he finally conceded that with your question, Your Honor. And I would just close by completing the point that I started at the beginning of my argument, which is that you can be sure that the FCC is wrong in its assessment of Annex B because the Commission insists that the purpose of Annex B is to guarantee that there will never be two non-commonly owned major channels that are overlapping in the same service area with the same major channel. We know that's wrong because you just look at paragraph 8 of the 2006 version, and what it says is it guarantees that there will never be an overlap of the two-part combination in the market. Not the major channel, but a two-part combination in the same market. So the Commission has clearly misinterpreted that absolutely clear statement of what Annex B guarantees, and that's confirmed because if you look at paragraphs 5, 6, and 7 of Annex B, it gives you instances of when there are going to be overlapping major channels which are okay and they're permitted and contemplated by the protocols as long as the minor channels are different. So the FCC has to be wrong in the way it's interpreted this annex. Thank you very much. The case is submitted.
judges: Griffith, Wilkins, Katsas